# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**JANE DOE INDIVIDUALLY AND ON
BEHALF OF JOHN DOE,** *et al.,*

        **Plaintiffs,**

      **v.**

**TEAYS VALLEY LOCAL SCHOOL
BOARD OF EDUCATION,** *et al.,*

        **Defendants.**

      **Case No. 2:23-cv-2704
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment filed by Defendants. (ECF No. 48.) Plaintiffs Jane Doe and her son, John Doe, oppose the Motion. (ECF No. 71.) Defendants replied. (ECF No. 76.) For the reasons below, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 48) on Plaintiffs' federal law claims and declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims.

## BACKGROUND

The facts in this case are serious and lugubrious. Plaintiffs filed this lawsuit seeking redress for harms John Doe endured while attending Teays Valley Middle School. (ECF No. 9, ¶¶ 2–3.) During the 2020-2021 school year, Defendant Mandy Davis, a classroom aide, sexually abused John Doe, who was at the time a sixth-grade student enrolled at Teays Valley Middle School. (John Doe Dep., ECF No. 52, 69:18–20.)

The abuse culminated in a criminal conviction for rape. (ECF No. 9, ¶¶ 49–51; *see also State of Ohio v. Mandy R. Davis*, Case No. 2021-cr-78 (Pickaway County Common Pleas).) Plaintiffs now sue the Teays Valley Local School Board of Education ("Board"), and several school officials, alleging that the school officials knew about the inappropriate relationship

between John Doe and Mandy Davis and failed to intervene to prevent the sexual abuse. (ECF No. 9, ¶¶ 29–48.)

Plaintiffs name the Principal (Michael Kauffeld) and Assistant Principal (Marcy Aquino), along with several other employees: Mallory Beckman, Callie Crosby, Joyce Duchak, Amber Rice, and John Roes #1-5. (*Id.* ¶¶ 18–28.) Ms. Beckman was a Lunchroom Monitor and Front Office Assistant, and Ms. Crosby was a Lunchroom Monitor. (*Id.* ¶¶ 20–21.) Ms. Duchak was the school Guidance Counselor and Ms. Rice was the office Secretary. (*Id.* ¶¶ 22–23.) Defendants John Roes #1-5 have not been identified, but Plaintiffs allege they are "other Board employees" who knew of the risks posed to John Doe. (*Id.* ¶ 28.)

## I.    FACTUAL BACKGROUND

The Lunchroom Monitors—Ms. Beckman and Ms. Crosby—first noticed what they describe as a "weird" relationship between Davis and John Doe in March 2021. (Beckman Dep., ECF No. 69, 23:19–24:16; Crosby Dep., ECF No. 65, 30:19–22.) John Doe was in a relationship with Davis's daughter who also in the sixth grade. (John Doe Dep., ECF No. 52, 69:18–71:01.) The teachers at the school were aware of this and thought, at first, that it explained the relationship between Davis and John Doe. (*See*, *e.g.*, Beckman Dep., ECF No. 69, 38:05–18; Crosby Dep., ECF No. 65, 26:05–16.)

During one lunch period, Ms. Beckman observed John Doe and Davis whispering to each other. (Beckman Dep., ECF No. 69, ¶¶ 34:02–21.) And even though John Doe's table was the first released from lunch, he would wait for Davis before leaving. (*Id.*) Ms. Beckman also saw Davis and John Doe "standing shoulder-to-shoulder talking" during John Doe's gym class. (*Id.* 45:09–46:07.) Ms. Beckman and Ms. Crosby assumed Davis was overly involved in her daughter's

relationship with John Doe. (Beckman Dep., ECF No. 69, 38:05–18; Crosby Dep., ECF No. 65, 26:05–16.)

Then, Ms. Crosby testified about a conversation she had with Davis in late March or early April. (Crosby Dep., ECF No. 65, 33:05–34:21.) During lunch, Davis told her that John Doe was in a lot of pain. (*Id.*) When Ms. Crosby asked what from, Davis said that he had put hand sanitizer on his hands, went to the restroom, and then his penis felt like it was burning. (*Id.*) It was strange for a student to discuss their private parts with a teacher, said Ms. Crosby. (*Id.* 34:04–11.) So she shared her concerns with Amber Rice, who was the office Secretary. (*Id.* 37:04–09.) After the hand sanitizer incident, Ms. Crosby testified that things got "more and more fishy." (*Id.* 37:15–24.)

### A. Teachers first reported their concerns to Principal Kauffeld in April 2021.

On April 8, 2021, Amber Rice emailed Mr. Kauffeld to report concerns she had about Davis. (ECF No. 59-8, PageID 1345; *see also* Kauffeld Dep., ECF No. 59, 79:01–82:21.) Her email recounts that Ms. Beckman told her "several times" that John Doe follows Davis around the cafeteria and that they were "always whispering." (ECF No. 59-8, PageID 1345.) She herself observed Davis pull John Doe from class and talk to him in private at the end of a corridor. (*Id.*) When questioned, Davis informed Ms. Rice that John Doe struggled to open up but felt more comfortable confiding in her. (*Id.*) Ms. Rice asked Mr. Kauffeld to refer John Doe to Ms. Duchak, the Guidance Counselor, and said "[t]his student could be dealing with something that needs someone's attention other than the mother of his girlfriend or an aide." (*Id.*)

Mr. Kauffeld testified that he asked Marcy Aquino, the Assistant Principal, to discuss Ms. Rice's concerns with Davis. (ECF No. 59, 88:17–20.) There are discrepancies in Mr. Kauffeld's notes about when Ms. Aquino had that discussion. (*Compare* ECF No. 59-6, PageID 1337 (referring to April 10, 11, or 12 and stating, "Not sure when Marcy talked to Mandy"); *with* ECF No. 59-7, PageID 1341 (stating Ms. Aquino contacted Davis on April 16).) Nevertheless, his notes

3

suggest that Ms. Aquino called Davis and "discussed staff perception and suggested she stay away from the student." (*Id.* 90:05–21; *see also* ECF No. 59-7, PageID 1341; Aquino Dep., ECF No. 63, 27:23–30:13.) Davis told Ms. Aquino that she was friends with John Doe's mom and his mom had asked her to help him with his anxiety. (*Id.*; *see also* Aquino Dep., ECF No. 63, 39:01–15.)

On April 13, Ms. Duchak emailed Mr. Kauffeld noting that John Doe had been skipping his Viking Period—an intervention group where students can get extra help if they need it—for several weeks and instead had been going to Davis's classroom. (ECF No. 59-1, PageID 1328; *see also* Kauffeld Dep., ECF No. 59, 94:20–95:22; Duchak Dep., ECF No. 61, 22:21–26:24.) When teachers asked him, he lied and said he planned to see Ms. Duchak. (*Id.*)

Two days later, on April 15, Ms. Beckman witnessed Davis writing LOVE on John Doe's knuckles during lunch. (Beckman Dep., ECF No. 69, 16:20–17:15; Crosby Dep., ECF No. 65, 38:05–39:21.) Davis had a similar permanent tattoo on her knuckles. (ECF No. 69, 16:20–17:15.) Ms. Beckman recorded the incident in her notes (ECF No. 69-2, PageID 1775), and immediately reported it to Mr. Kauffeld (Beckman Dep., ECF No. 69, 53:01–15). She suggested that the school separate Davis and John Doe, and Mr. Kauffeld told her he had spoken to Davis about it. (*Id.* 54:07–19.) Mr. Kauffeld testified that when he spoke with John Doe in passing in the hallway about this later, he did not see any writing on his hands. (Kauffeld Dep., ECF No. 59, 97:15–24.)

The next day, Ms. Beckman emailed Ms. Duchak that she saw Davis and John Doe talking for eight to nine minutes in the dining room. (ECF No. 69-1, PageID 1774.) Ms. Duchak encouraged her to report this to Mr. Kauffeld immediately. (*Id.*) Mr. Kauffeld does not recall if Ms. Beckman reported the incident to him. (Kauffeld Dep., ECF No. 59, 112:10–113:04.)

**B. Mr. Kauffeld and Ms. Aquino met with Davis on April 19, 2021.**

Mr. Kauffeld and Ms. Aquino met with Davis on April 19, 2021. (ECF No. 59-6, PageID 1337; ECF No. 59-7, PageID 1341; *see also* Aquino Dep., ECF No. 63, 34:17–23; Kauffeld Dep.,

ECF No. 59, 113:05–19.) They shared that teachers were concerned about the time she was spending with John Doe and asked her to distance herself. (*Id*.)

### C. Teachers raise additional concerns in April and early May.

On April 23, while reviewing video footage, Mr. Kauffeld testified that he saw Davis and John Doe whispering to each other in the hallway. (Kauffeld Dep., ECF No. 59, 124:10–125:04.) A representative of the teachers' union voiced certain teachers' concerns about Davis to Mr. Kauffeld on the same day. (*Id.* 119:02–121:16.) Mr. Kauffeld then spoke to Davis about her not following his warning to separate herself from John Doe. (*Id.* 125:05–23.)

On May 5, Ms. Crosby reported another incident to Mr. Kauffeld. She told him that Davis was in the cafeteria waiting for the sixth graders to come in for their lunch period. (Crosby Dep., ECF No. 65, 48:01–50:22; *see also* Beckman Dep., ECF No. 69, 60:24–61:25.) When they did, Davis got up from her table, leaving a cell phone behind, which John Doe picked up and put in his pocket soon after. (*Id.*) Mr. Kauffeld then confirmed this by watching video footage from the cafeteria. (ECF No. 59, 138:12–139:22.) His notes, however, indicate he did not watch the video until May 11, a week later. (*Id.* 140:06–15; *see also* ECF No. 59-6, PageID 1338.)

On May 7, which was a Friday, Ms. Duchak reported two more incidents to Mr. Kauffeld. (ECF No. 61-3, PageID 1452.) She explained that the day before a teacher saw John Doe hiding in the bathroom on several occasions waiting for Davis. (*Id.*; *see also* Duchak Dep., ECF No. 61, 37:18–25.) She herself "observed [Davis] quietly speaking to [John Doe] numerous times at lunch, and then [Davis] walked [John Doe] out of the lunchroom upon dismissal and they both went into [Davis's] room, which was very dark instead of [John Doe] going to class." (ECF No. 61-3, PageID 1452.) She informed Mr. Kauffeld, who was attending a conference, and also brought her concerns to the school superintendent, Kyle Wolfe. (*Id.*)

5

### D.  Mr. Kauffeld began an investigation on the same day John Doe was raped.

According to Mr. Kauffeld's notes, he opened an informal investigation into Davis on Monday, May 10. (Kauffeld Dept., ECF No. 59, 129:09–20; ECF No. 59-6, PageID 1337–38.) The school superintendent, Kyle Wolfe, asked him contact John Doe's mother. (*Id.*) Mr. Kauffeld wanted to interview witnesses before doing so. (*Id.*) He also asked Ms. Beckman, who saw John Doe getting into Davis's van after school, to call John Doe's mom to make sure she was aware he was not riding the bus. (*Id.* 136:18–137:13; *see also* ECF No. 59-6, PageID 1338.)

Unbeknownst to Mr. Kauffeld, Davis sexually abused John Doe after school later that same day—May 10, 2021. (John Doe Dep., ECF No. 52, 156:14–157:08.) He testified that he and Davis planned to have sexual intercourse at her house after school, when her husband and her children would not be home. (*Id.*; *see also* ECF No. 52-3, PageID 925 (report from police officer conducting forensic interview).)

John Doe also confirmed many of the events described above leading up to the sexual abuse on May 10. He testified that by May, he saw Davis every day at school. (John Doe Dep., ECF No. 52, 85:14–19.) He would seek her out at lunch and in the hallways between class periods. (*Id.* 86:20–88:11.) Often, she would observe his gym classes. (*Id.* 85:18–86:19.) Before his math class he would visit Davis's classroom where she would rub CBD oils on his wrists. (*Id.* 98:23–100:22.) And she often drove him home from school. (*Id.* 81:11–21, 132:05–11.) He also admitted to texting Davis, and that some of those text messages were sexual in nature. (*Id.* 116:03–06.)

### E.  Mr. Kauffeld met with Jane Doe on May 11, 2021.

Without knowledge of the assault, Mr. Kauffeld met with Jane Doe the next day to share his concerns. (Jane Doe Dep., ECF No. 50, 88:17–90:19.) Ms. Aquino, the Assistant Principal, also attended that meeting. (*Id.* 89:01–09.)

Mr. Kauffeld asserts that he summarized what he learned from the interviews he conducted the day before. (ECF No. 59-6, PageID 1338.) He says that Jane Doe knew Davis had texted and called her son before, and she had asked Davis to stop. (*Id.*) Jane Doe blocked Davis's number only to find out that John Doe unblocked it and then deleted messages, says Mr. Kauffeld. (*Id.*)

Jane Doe remembers the conversation differently. According to Jane Doe, Mr. Kauffeld told her that he saw footage of Davis meeting her son outside the boys' restroom. (ECF No. 50, 89:06–14.) She asked if Davis went into the restroom with her son, and Mr. Kauffeld said no. (*Id.*) She asserts that until Mr. Kauffeld told her on May 11, she did not know that Davis had been texting her son. (*Id.*) After the meeting, she texted Davis to stop contacting John Doe, she says. (ECF No. 50, 92:02–97:09; *see also* ECF No. 50-1, PageID 610.) Despite telling Davis to stop, when she looked through John Doe's phone the next day, Davis had continued to message him. (ECF No. 50, 107:19–24; 109:10–24.) She texted Davis again to have no contact with her son, and this was her third, and final, warning. (ECF No. 50-1, PageID 615.)

### F. Mr. Kauffeld removed Davis from school grounds on May 12, 2021.

Mr. Kauffeld consulted with the school superintendent after his meeting with Jane Doe. Based on that meeting and his conversation with Mr. Wolfe, Mr. Kauffeld determined that Davis's services were no longer needed. (ECF No. 59-4, PageID 1333.) He brought Davis in to discuss the decision on May 12 and sent a letter documenting the decision the next day. (ECF No. 59-4, PageID 1333; *see also* ECF No. 59-6, PageID 1339 (recounting that during the meeting he told Davis that "I cannot let you work here until we figure this out").) The letter, prepared by counsel for the Board, explained that her recent conduct violated the Board's policies and she would not be recommended for a contract for the next school year. (ECF No. 59-4, PageID 1333.) Mr. Kauffeld and Ms. Duchak also contacted the Pickaway County Children Services regarding Davis's conduct. (ECF No. 59, 152:09–18.)

### G. Jane Doe learned of Davis's abuse on May 15, 2021.

Jane Doe did not learn that Davis sexually abused her son until May 15. (Jane Doe Dep., ECF No. 50, 125:05–26:13, 128:01–17.) Suspicious that John Doe was hiding something, she asked her husband, John Doe's stepdad, to take him for a drive. (*Id.*) During that drive, John Doe told him that he and Davis had sexual intercourse on May 10, 2021. (*Id.*) Jane Doe and her husband called the police. (*Id.* 128:19–135:22.) The police arrived and took statements from Jane Doe, John Doe, and the stepdad. (*Id.*; *see also* ECF No. 50-3, PageID 653–58.)

Mandy Davis was arrested on charges of rape, gross sexual imposition, and unlawful sexual conduct with a minor on May 18, 2021. (*See* ECF No. 59-5, PageID 1335; *see also State of Ohio v. Mandy R. Davis*, Case No. 2021-cr-78 (Pickaway County Common Pleas).) She eventually pleaded guilty to rape and was sentenced to a term of imprisonment of 10 years to life. (ECF No. 9, ¶¶ 50–51.)

### II.    PROCEDURAL BACKGROUND

Plaintiffs sued Davis, the Board, Mr. Kauffeld, Ms. Aquino, Ms. Beckman, Ms. Crosby, Ms. Duchak, Ms. Rice, and John Roes #1-5. (*See* ECF No. 9.) They bring a Title IX claim against the Board (Count 1); a Section 1983 claim against Defendants Kauffeld, Aquino, Beckman, Crosby, Duchak, and Rice ("individual Defendants"), Defendant Davis, and the Board (Counts 2 and 3); an Ohio law claim for civil assault and battery against Defendant Davis (Count 4); an Ohio law claim for civil liability for criminal acts against Defendants Davis, Kauffeld, and Aquino (Count 5); an Ohio law intentional infliction of emotion distress claim ("IIED") against Davis, the individual Defendants, and John Roes #1-5 (Counts 6 and 7); a claim under Ohio law for wanton and reckless conduct against the individual Defendants (Count 8); a claim for liability based on respondeat superior against the Board (Count 9); and a loss of consortium claim against all Defendants (Count 10). (ECF No. 9.)

8

**STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

**ANALYSIS**

The Court begins by addressing Plaintiffs' claims against Defendants Davis and John Roes #1-5 who have not been served in this action. Next, the Court analyzes whether Plaintiffs have shown genuine issues of material fact on their federal law claims under Title IX and 42 U.S.C. § 1983. Because the Court finds that they have not, Plaintiffs federal law claims fail and the Court declines to exercise supplemental jurisdiction over the remaining state-law claims.

I.      **The Court dismisses without prejudice Defendants Davis and John Roes #1-5.**

Defendants Davis and John Roes #1-5 have not been served and have not answered the Amended Complaint or responded to the Motion for Summary Judgment. The Court ordered Plaintiffs to show cause for the failure to effect service and warned that a failure to do so would result in dismissal of those parties and Plaintiffs' claims against them under Rule 4(m) of the Federal Rules of Civil Procedure. (ECF No. 77); Fed. R. Civ. P. 4(m) (requiring dismissal without prejudice if a plaintiff fails to complete service within 90 days of filing the complaint without a showing of good cause). Plaintiffs did not respond and the time to do so has passed.

Since Plaintiffs failed to identify and serve Defendants Davis and John Roes #1-5, the Court **DISMISSES without prejudice** the claims against them. The claims against Defendant Davis under Counts 4 and 6 are **DISMISSED without prejudice**.

II.     **The Board is entitled to summary judgment on John Doe's Title IX claim.**

Defendants move for summary judgment on John Doe's claim against the Board under Title IX.[1] (ECF No. 48, PageID 361–64.) The Board does not dispute that its employee, Mandy Davis, sexually abused John Doe. (*Id*.) It contends, however, that the Court should grant it summary judgment because it did not have actual notice of the sexual assault and was not deliberately indifferent. (*Id.*)

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Recipients of federal funds have a duty not to allow teacher-student harassment under Title IX. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (cleaned up). The Board concedes

---

[1] Plaintiffs consent to the dismissal of Jane Doe's Title IX claim under Count 1, and to dismiss the Title IX claim against the individual Defendants. (ECF No. 71, PageID 1790, 1812.)

that it is a public entity and political subdivision under the laws of the State of Ohio which received federal financial assistance. (Answer, ECF No. 6, ¶ 19.) The statute, therefore, permits a student to hold a school district, including the Board, liable for damages for a teacher's sexual harassment. *Williams v. Paint Valley Loc. Sch. Dist.*, 400 F.3d 360, 366 (6th Cir. 2005) (citing *Gebser v. Lago Vista Indep. Sch. District*, 524 U.S. 274, 282 (1998)).

To succeed on teacher-student sexual harassment claim, a plaintiff must show: (1) a teacher sexually harassed the plaintiff; (2) an official with authority to take corrective action had actual notice of a substantial risk that the teacher would harass a student like they harassed plaintiff; (3) the school's response exhibited deliberate indifference to that risk; and (4) the school's deliberate indifference caused the plaintiff to suffer discrimination. *Wamer v. Univ. of Toledo*, 27 F.4th 461, 471 (6th Cir. 2022) (citing *Gebser*, 524 U.S. at 290–91; *Williams*, 400 F.3d at 368).

John Doe has introduced sufficient factual evidence on the first and second elements. But because he cannot show that the school was deliberately indifferent, the Board is entitled to summary judgment.

### A. Mandy Davis sexually abused John Doe.

The first element is straightforwardly met. Defendant Davis was an instructional aide employed by the Board, which qualifies as a teacher under Title IX. *See Doe v. Bd. of Educ. of Columbus City Sch.*, No. 2:23-cv-1006, 2025 U.S. Dist. LEXIS 52210, at *17 (S.D. Ohio Mar. 20, 2025) (Watson, J.). The parties agree that Davis was convicted of rape in the Pickaway County Court of Common Pleas for raping John Doe. (ECF No. 9, ¶¶ 49–51 (*State of Ohio v. Mandy R. Davis*, Case No. 2021-cr-78 (Pickaway County Common Pleas).)

**B. Viewing the facts in a light most favorable to John Doe, the Court finds the school district had actual notice of the substantial risk to John Doe.**

A school district can only be liable if it has "actual notice of . . . the teacher's misconduct." *Gebser*, 524 U.S. at 277. Actual notice is ultimately a question of who knew what and when. *Doe v. Bd. of Educ. of Columbus City Sch.*, 2025 U.S. Dist. LEXIS 52210, at *18 (quoting *Doe v. Hamilton Cnty. Bd. of Educ.*, 329 F. Supp. 3d 543, 564 (E.D. Tenn. 2018)).

A school district is considered to have actual notice if an appropriate person knew of the harassment. *Id.* (citing *Gebser*, 524 U.S. at 290). An appropriate person is an official "with authority to take corrective action to end the discrimination." *Id.* This Court has held that "[p]ublic school principals . . . generally qualify as 'appropriate' people in Title IX teacher-student sex abuse cases." *Id.* (citing *Doe v. Farmer*, No. 3:06-0202, 2009 U.S. Dist. LEXIS 104152, at *24 (M.D. Tenn. Nov. 9, 2009) (collecting cases)).

Principal Kauffeld was an appropriate person. He had the authority to discipline teachers and staff, and to initiate an investigation, as he did in this case. Disciplinary action and investigations are both corrective measures that could end the purported harassment. Thus, John Doe has pointed to at least one appropriate person for the purposes of analyzing actual notice.

Next, the Court examines what Mr. Kauffeld knew about the risks Davis presented to John Doe. To have actual notice, John Doe must show that Mr. Kauffeld knew of a substantial risk that the teacher would sexually abuse a student like the plaintiff. *Herman v. Ohio Univ.*, No. 2:19-cv-201, 2019 U.S. Dist. LEXIS 202813, at *16 (S.D. Ohio Nov. 22, 2019) (Morrison, J.). Actual knowledge can involve current or prior complaints of abuse. *Id.* (citing *Adams v. Ohio Univ.*, 300 F. Supp. 3d 983, 996 (S.D. Ohio 2018) (Morrison, J.)).

Mr. Kauffeld received the first report about Davis's behavior one month before John Doe was raped. Amber Rice had emailed Mr. Kauffeld on April 8, 2021, recounting "several times"

12

where Lunchroom Monitors saw John Doe following Davis around the cafeteria and that they were "always whispering." (ECF No. 59-8, PageID 1345; *see also* Beckman Dep., ECF No. 69, 25:01–16, 34:02–21, 45:09–46:07 (describing times when she saw Davis whispering to John Doe).)

Soon after, Davis told Ms. Crosby that John Doe made comments to her about his penis. He told Davis that his penis burned from hand sanitizer that he had put on his hands before using the restroom. (Crosby Dep., ECF No. 65, 33:05–34:21.) In her experience, Ms. Crosby had never had a student share anything about their private parts, so Ms. Crosby shared her concerns with Amber Rice. (*Id.* 34:09–21, 37:04–09.)

On April 13, Mr. Kauffeld learned that John Doe was skipping his tutoring session during Viking Period, without permission, to spend time with Davis in her classroom. (Kauffeld Dep., ECF No. 59, 94:20–95:22; ECF No. 59-1, PageID 1328.) Two days later, Ms. Beckman reported observing Davis writing "LOVE" on John Doe's knuckles during lunch to match a similar permanent tattoo on her knuckles. (Beckman Dep., ECF No. 69, 16:20–17:15 (describing the incident); 53:01–15 (reporting the incident).)

On May 5, days before John Doe was raped, another incident occurred. As the sixth graders were coming in for lunch, Ms. Crosby saw Davis leave a cell phone on a table, that John Doe subsequently picked up and put in his pocket. (Beckman Dep., ECF No. 69, 60:24–61:25.) She reported this to Mr. Kauffeld, who confirmed the incident occurred by watching video footage from the cafeteria. (Kauffeld Dep., ECF No. 59, 138:12–139:22.)

But the parties disagree about when Mr. Kauffeld learned of the phone incident. John Doe argues that he learned about it the day Ms. Crosby reported it—May 5. (ECF No. 71, PageID 1806.) But the Board asserts that he did not have actual notice until he confirmed it occurred by watching the video footage, which he did on May 11. (Kauffeld Dep., ECF No. 59, 140:06–15;

*see also* ECF No. 59-6, PageID 1338.) Viewing the facts in a light most favorable to John Doe, the Court will proceed assuming Mr. Kauffeld learned that Davis secretively gave John Doe a cellphone on May 5.

On May 7, Mr. Kauffeld received reports of two more incidents involving Davis and John Doe. (ECF No. 61-3, PageID 1452.) Ms. Duchak saw Davis whispering to John Doe, walking John Doe out of lunch, and John Doe going into Davis's classroom alone. (*Id.*) A different teacher reported to Ms. Duchak that John Doe was hiding in the bathroom on four occasions waiting for Davis. (*Id.*; *see also* Duchak Dep., ECF No. 61, 37:18–25.) She notified Mr. Kauffeld, but because he was out of office, she also brought her concerns directly to the school superintendent, Kyle Wolfe. (*Id.*) Mr. Wolfe asked Mr. Kauffeld to speak with John Doe's mother about the teachers' concerns. Before doing so, Mr. Kauffeld interviewed the witnesses who raised concerns. (ECF No. 59-6, PageID 1337–38.) He conducted those interviews on May 10, the same day that he later learned John Doe was raped. (*Id.*)

To sum, John Doe has put forth sufficient evidence that in the month before his abuse, Mr. Kauffeld knew Davis was engaging in behaviors that crossed a boundary with the student. On May 5, five days before he was raped, Mr. Kauffeld had learned, or at the very least suspected, that Davis was texting John Doe because a teacher saw Davis secretively leave a cellphone for John Doe in the cafeteria. Mr. Kauffeld confirmed that this occurred by watching video footage.

This Court has found that "[s]ome teacher-student texts reflect a 'substantial risk' of sexual harassment" as to put the school on notice. *Doe v. Bd. of Educ. of Columbus City Sch.*, 2025 U.S. Dist. LEXIS 52210, at *21. The substantial risk, however, should not be inferred unless the school administrator suspected that the text messages contained sexual content. *Id.* (citing *Campbell v. Dundee Cmty. Sch.*, 661 F. App'x 884, 886–87, 888–89 (6th Cir. 2016)). Suspecting that the texts

14

are sexual in nature, even without confirmation, is enough. *Id.* (citing *Thorpe v. Breathitt Cnty. Bd. of Educ.*, 8 F. Supp. 3d 932, 944 (E.D. Ky. 2014)).

The inference that Mr. Kauffeld suspected the texts with John Doe were sexual is not especially strong. Mr. Kauffeld asserts he did not suspect that Davis was texting John Doe until May 11, when he met with Jane Doe. But the Court has an obligation to make inferences in John Doe's favor on a motion for summary judgment. According to John Doe, Mr. Kauffeld had notice that Davis secretively gave John Doe a cellphone, presumably to communicate with him, on May 5. He was also aware of allegations that Davis wrote LOVE on John Doe's knuckles, and of multiple teacher reports expressing concerns about the amount of time Davis spent with John Doe. Since the Board's knowledge is a close call, the Court will assume without deciding that Mr. Kauffeld had actual notice of the substantial risk of sexual harassment the week before John Doe was sexually abused.

### C. John Doe has not shown that genuine issues of material fact remain as to whether the School was deliberately indifferent to Davis's misconduct.

Under the second prong of a Title IX teacher-student harassment claim, the Court analyzes whether the school was deliberately indifferent to the misconduct alleged. A school district can be liable for teacher-student harassment only if the plaintiff shows that the district was deliberately indifferent. *Gebser*, 524 U.S. at 290–91. Deliberate indifference arises when the response, or lack thereof, to the teacher-student abuse is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.

A school's "failure to take *any* disciplinary action despite reports of repeated sexual harassment rises to the level of deliberate indifference." *McCoy v. Bd. of Educ.*, 515 F. App'x 387, 391 (6th Cir. 2013) (citing *Davis*, 526 U.S. at 654) (emphasis in original). A school is thus deliberately indifferent if it is "aware of the misconduct" but does "nothing to stop it, despite its

ability to exercise control over the situation." *Horner v. Ky. High Sch. Athletic Assn.*, 206 F.3d 685, 692 (6th Cir. 2000).

When a school takes some action but the plaintiff argues the action was insufficient, "the proportionality of the school's response in light of available information lies at the heart of the indifference analysis." *McCoy*, 515 F. App'x at 391. If a school knows that its remedial action is inadequate, it should take additional steps to eliminate the behavior. *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) (analyzing student-student harassment claim). Continuing to use the same ineffective methods to no avail is evidence that the school failed to act reasonably considering known circumstances. *Id.*

In *McCoy*, the Sixth Circuit granted the school district summary judgment on deliberate indifference in a teacher-student harassment case. 515 F. App'x at 391–92. "[T]he school was made aware of several instances of physical contact that were ostensibly non-sexual but could have served as potential indicia for sexual malfeasance." *Id.* at 392. In years before the plaintiff's allegations, when the teacher worked at a different school, he pinched students' chest and posteriors, touched a different student's thigh, and kicked a female student in the behind. *Id.* at 389. But the school had only "sparse" knowledge of these instances since they occurred at other schools, and the misconduct was less apparent than in other cases of Title IX liability. *Id* "In hindsight, the school district could certainly have done more[,]" said the Sixth Circuit. *Id.* But that is not the standard. *Id.* "Had there been a more discernible and explicit form of sexual harassment, in the form of verbal or physical sexual contact, the district's decision to repeat its measure may have constituted deliberate indifference." *Id.* Without more though, the Title IX claim failed. *Id.*

Compare *McCoy*, to cases where schools were considered deliberately indifferent to sexual harassment. In *Vance*, although a case of student-student harassment, the Court found that the

16

school was deliberately indifferent because it never investigated the victim's repeated complaints of harassment. 231 F.3d at 256–57, 261–62. Similarly, in *Patterson*, when the victim's sexual harassment escalated over four years, it was clearly unreasonable for the administrator to employ the same tactics—verbal reprimands—to stop the harassment. *Patterson v. Hudson Area Schools*, 551 F.3d 438, 448–50 (6th Cir. 2009).

And in a recent teacher-student sexual harassment case, this Court found that a school was deliberately indifferent after a prior student's mother reported that the teacher was sending sexual texts to her son late at night. *Doe v. Bd. of Educ. of Columbus City Sch.*, 2025 U.S. Dist. LEXIS 52210, at *27–29. The principal did not investigate but told the teacher to stop communicating with students, but the teacher later engaged in a similar pattern of sexual harassment culminating in the sexual assault of the plaintiff. *Id.* Merely telling the teacher to stop communicating with students, without further investigation, was unreasonable given that the principal knew of the sexual nature of the text messages. *Id.* (distinguishing *McCoy*).

In the cases above, the schools failed to address sexual harassment that persisted over years. *McCoy*, 515 F. App'x at 391–92 (describing incidents over six years); *Patterson*, 551 F.3d at 448 (escalating harassment over four years); *Doe v. Bd. of Educ. of Columbus City Sch.*, 2025 U.S. Dist. LEXIS 52210 (learning of the sexual texts with a different student in 2016—years before plaintiff's assault in 2019). Here, only a month separated the first report to Mr. Kauffeld—which was not a report of sexual harassment—and John Doe's sexual abuse.

Mr. Kauffeld also took more steps to address the sexual harassment in a single month than many administrators in the cases above did over the course of several years. True, "[i]n hindsight, the school district could certainly have done more." *McCoy*, 515 F. App'x at 392. But as the Sixth Circuit has explained, what the school could have done to prevent the abuse is not the standard by

which this Court is to judge the school's response. *Id.* The Court asks whether the school's response was clearly unreasonable considering the information available to it. *Id.* And here, Mr. Kauffeld's actions were not clearly unreasonable.

In each instance, Mr. Kauffeld proportionately ratcheted up his response to Davis's misconduct. First, he deployed Ms. Aquino to discuss appropriate boundaries with Davis after he received reports that she was whispering to John Doe at school. (ECF No. 59-6, PageID 1337.) This response was reasonable given that several teachers understood that John Doe was dating Davis's daughter. (*See* Beckman Dep., ECF No. 69, 38:05–18; Crosby Dep. ECF No. 65, 26:05–16 (discussing how they assumed Davis was overly involved in her daughter's relationship).)

After Ms. Beckman reported that Davis wrote LOVE on John Doe's hands, Mr. Kauffeld said he spoke with John Doe in passing and did not see writing on his hands. (Kauffeld Dep., ECF No. 59, 97:15–24.) Even without substantiating Ms. Beckman's report, Mr. Kauffeld met with Davis on April 19. (ECF No. 59-6, PageID 1337; ECF No. 59-7, PageID 1341.)

He verbally warned Davis again on April 23, after seeing video footage of her whispering to John Doe in the hallways. (ECF No. 59, 124:10–125:04.) He expressed his concern that she was not following his recommendation to separate herself from John Doe. (*Id.* 125:05–23.)

When he learned that Davis secretively left a cellphone for John Doe in the cafeteria, he consulted with the school superintendent Kyle Wolfe and set up a meeting with John Doe's parents. (Beckman Dep., ECF No. 69, 60:24–61:25 (reporting the phone incident); Kauffeld Dep., ECF No. 59, 130:04–20 (explaining Mr. Wolfe's advice to contact Jane Doe).) To prepare for the meeting with Jane Doe, he began an informal investigation and interviewed witnesses on May 10. (Kauffeld Dep., ECF No. 59, 132:17–136:17.)

18

He met with Jane Doe on May 11. At that meeting, he asserts that he learned that Davis had been texting John Doe despite Jane Doe's request that she stop.[2] (*Id.* 42:04–18; *see also* ECF No. 59-6, PageID 1339.) Based on this information, Mr. Kauffeld decided that Davis had violated school policies. (*Id.*) He decided to remove Davis from school grounds for the rest of the school year and informed her of his decision the next morning. (ECF No. 59-6, PageID 1339.)

Put more succinctly, after the first clear violation of the Board's policies—when Davis secretively gave John Doe a cellphone, he set up a meeting with the parents, began an informal investigation, and removed Davis from school grounds within days. This happened in less than one month. Without more discernible or explicit sexual harassment, in the form of verbal or physical sexual contact or communication, the school's decision to repeatedly verbally warn Davis to distance herself was not clearly unreasonable. John Doe has not shown that the school intentionally disregarded known risks.

Since he cannot establish deliberate indifference, the Court need not analyze the fourth element—whether he has shown that the Board's deliberate indifference caused his sexual abuse. His Title IX claim fails. The Motion for Summary Judgment is **GRANTED** as to Count 1.

### III.     Defendants are entitled to summary judgment on Plaintiffs' § 1983 claims.

Count 2 of the Amended Complaint brings a § 1983 claim against the individual Defendants. (ECF No. 9.) Count 3 asserts a § 1983 claim against the Board. (*Id.*) Section 1983 permits a person to seek redress if they are deprived of "any rights, privileges, or immunities

---

[2] The Board devotes considerable attention to when Jane Doe learned that Davis was texting her son. It argues that she knew long before the meeting with Mr. Kauffeld. (*See* ECF No. 50-1, PageID 582–83 (text message from Jane Doe to Davis that says "You've been texting his phone" sent on April 1, 2021).) But when Jane Doe learned of the texting is immaterial, it does not change when the school, and specifically Mr. Kauffeld, learned that Davis was inappropriately texting a student.

secured by the Constitution and laws," under the color of "any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983.

### A. The individual Defendants are entitled to qualified immunity.

The individual Defendants argue that they are entitled to qualified immunity on Plaintiffs' individual capacity[3] claims against them under Count 2. (ECF No. 48, PageID 364–65.) Qualified immunity protects government officials performing discretionary functions from liability so long as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known. *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Courts use a two-part test to determine whether a government official is entitled to qualified immunity. First, they determine whether "the official's conduct violated a constitutional right." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017) (citation omitted). Next, if the answer is yes, courts must determine "whether the right at issue was clearly established at the time of incident." *Id.* Although the prongs can be addressed in either order, both must be met, otherwise the government official is protected by qualified immunity. *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018).

The Sixth Circuit has held that students have a "clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity." *Doe v. Claiborne Cty.*, 103 F.3d 495, 506 (6th Cir. 1996). The right to bodily integrity "embraces the right to be free from sexual abuse at the hands of a public school employee." *Id.* And as Defendants acknowledge, a public official's deliberate indifference to known sexual harassment

---

[3] Plaintiffs' official capacity claims against the individual Defendants are considered claims against the municipality and will be addressed below. *See infra* Section III.B.

violates the Fourteenth Amendment. *Williams*, 400 F.3d at 366. Accordingly, at the time John Doe was sexually abused, he had a clearly established constitutional right to be free from such abuse.

Jane Doe argues that she has a clearly established constitutional "right to make decisions about John Doe's care, custody, and education." (ECF No. 71, PageID 1812 (citing *Troxell v. Granville*, 530 U.S. 57, 67 (2000).) By failing to adequately investigate Davis's sexual harassment, Jane Doe was deprived of her right to make decisions about her child's education and welfare, she says. (*Id.*)

Assuming Jane Doe has shown she has a clearly established right, the individual Defendants are still entitled to qualified immunity because they did not violate a clearly established right. It is undisputed that the individual Defendants themselves did not actually abuse John Doe. Plaintiffs instead attempt to hold the individual Defendants liable for constitutional injuries caused directly by Davis. *See Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002). Therefore, supervisory liability must attach for the § 1983 claim to survive. *Id.*

 "It is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless, or negligent in the performance of their duties." *Id.* at 439. Rather, "a plaintiff must show that, in light of the information the defendants possessed, the teacher who engaged in the sexual abuse showed a strong likelihood that he [or she] would attempt to sexually abuse other students, such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of the students." *Id.* (quoting *Claiborne County*, 103 F.3d at 513). Put differently, the defendants' conduct must amount to "a tacit authorization of the abuse." *Id.* (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). Generally, a mere failure to act is insufficient. *Id.* at 440 (citing *Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999)).

Plaintiffs argue that the individual Defendants failed to take appropriate actions in response to reports that Davis's conduct with John Doe crossed appropriate boundaries with a student. (ECF No. 71, PageID 1799–1801.) They assert that failing to make a mandatory report to children's services or law enforcement on or before May 7 demonstrated deliberate indifference to the risk of harm to John Doe. (*Id.*)

As shown above, Plaintiffs have not carried their burden of establishing a genuine dispute of material fact with respect to the individual Defendants' alleged deliberate indifference. *See supra* Part II.C. There was no widespread pattern of constitutional violations to show a strong likelihood that Davis would sexually abuse John Doe, or any other student. Each individual Defendant appropriately reported their concerns in a timely fashion, and Mr. Kauffeld acted on each report. He had Assistant Principal Aquino discuss boundary setting with Davis. He had a similar conversation with Davis and verbally warned her to distance herself from John Doe. Then he initiated an investigation, interviewed witnesses, contacted John Doe's mother, and eventually removed Davis from school grounds. These actions do not amount to a tacit authorization of the abuse. The record does not show that the individual Defendants infringed upon John Doe's right to be free from sexual abuses in school or Jane Doe's rights to protect John Doe's welfare. Plaintiffs have cited no law suggesting otherwise. Therefore, the individual Defendants are entitled to qualified immunity on Plaintiffs' § 1983 claims against them.

The Motion for Summary Judgment is **GRANTED** as to Count 2.

### B. The Board is entitled to summary judgment on Plaintiffs' § 1983 claim for municipal liability.

To determine whether Plaintiffs' municipal liability claim is valid under Count 3, the Court looks to (1) whether Plaintiffs were deprived of a constitutional right; and (2) whether the municipal entity—here, the Board—is responsible for that violation. *Claiborne Cnty.*, 103 F.3d at

505–06. As discussed above, the parties do not dispute that John Doe's injuries constitute a deprivation of a constitutional right. *See supra* Part III.A. Even assuming Jane Doe also suffered a deprivation of a right secured by the Constitution, both of their claims must fail because they cannot establish that the Board is responsible for the violation.

A school "cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom within the school district, leads to, causes, or results in the deprivation of a constitutionally protected right." *Claiborne Cnty.*, 103 F.3d at 505–06. Plaintiffs assert that the Board's policy or custom of inadequate training caused the violation of their rights. (ECF No. 71, PageID 1801–03.)

To succeed on a failure to train claim, a plaintiff must prove: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or caused the injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). The parties focus their arguments on the second prong—whether the Board was deliberately indifferent in its failure to train, supervise, and discipline its employees.

Plaintiffs concede that the Board had a policy in place requiring teachers to complete training on abuse, harassment, and bullying. (ECF No. 71, PageID 1802.) Rather than argue that the Board had no training policy, Plaintiffs instead assert that the Board's follow-up was inadequate. (*Id.*) According to Plaintiffs, the Board failed to follow up with educators who did not complete the training and testing requirements. (*Id.*)

The record does not support this assertion. The Board required teachers to complete in-service training through online training modules. (Kauffeld Dep., ECF No. 59, 19:01–22:17.) The Board administers the training modules through a vendor, PublicSchoolWORKS. (*Id.*) That vendor

determined which training modules were necessary for each teacher and sent the teachers the training modules, along with periodic reminders to complete the training before the deadlines. (*Id.*) Mr. Kauffeld would receive a list of teachers who did not timely complete any required trainings and he would email those teachers to remind them to do so. (*Id.* 21:14–21.) It was "rare" for teachers to not complete the trainings, says Mr. Kauffeld. (*Id.*)

Plaintiffs point to Ms. Crosby's admission that she once did not successfully complete a post-training exam on her first attempt. (Crosby Dep., ECF No. 65, 18:12–15.) That does not, however, mean that she did not later successfully complete that exam. She also made clear that she successfully completed the training, and the exam, on sexual harassment on her first attempt. (*Id.* 18:16–19:20.) Plaintiffs acknowledge that "multiple individual Defendants testified that they received training in sexual harassment and grooming." (ECF No. 71, PageID 1802.) They have not explained how that training, or the Board's follow up, were inadequate. (*See id.*) Without more, Plaintiffs fail to show that the teachers' training and supervision was inadequate, or that the alleged inadequacy was the result of the Board's deliberate indifference. *See Ellis*, 455 F.3d at 700–01. The absence of deliberate indifference is once again fatal to Plaintiffs' claim.

The Motion for Summary Judgment is **GRANTED** on Count 3.

## IV. The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims.

United States district courts are "courts of limited jurisdiction" that "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Once a court has original jurisdiction over some claims in the action, it can exercise supplemental jurisdiction over additional claims part of the same case or controversy. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *Ahearn v. Charter Twp.*, 100

24

F.3d 451, 454 (6th Cir. 1996) (explaining that claims are part of the same case or controversy if they derive from a "common nucleus of operative facts").

But supplemental jurisdiction is a matter of judicial discretion and "need not be exercised in every case in which it is found to exist." *Gibbs*, 383 U.S. at 726. And where "federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009).

The Court has granted summary judgment to Defendants on Counts 1, 2, 3, 4, and 6. The only claims remaining are Plaintiffs' state-law claims including: John Doe's claim under Ohio law for civil liability for criminal acts against Defendants Davis, Kauffeld, and Aquino (Count 5);[4] an Ohio law IIED claim against the individual Defendants (Count 7);[5] a claim under Ohio law for wanton and reckless conduct against the individual Defendants (Count 8);[6] a claim for liability based on respondeat superior against the Board (Count 9); and a loss of consortium claim against all Defendants (Count 10). (ECF No. 9.)

The Court finds that exercising supplemental jurisdiction over Plaintiffs' state-law claims after dismissing the federal claims would not serve judicial economy, convenience, or comity, and therefore declines to do so. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988). The state court is better equipped to interpret Plaintiffs' claims under Ohio law.

---

[4] Jane Doe consents to dismissal of her claim for civil liability for criminal conduct under Count 5. (ECF No. 71, PageID 1812.)

[5] Plaintiffs consent to dismissal of their IIED claim against the Board under Count 7. (ECF No. 71, PageID 1807.)

[6] Defendants assert that Ohio law does not recognize a separate cause of action for wanton or reckless conduct. Wanton and reckless is a level of intent that negates certain defenses to claims. *Doe v. Cleveland Metro. Sch. Dist. Bd. of Educ.*, 533 F. Supp. 3d 567, 575 (N.D. Ohio 2021) (citing *Cincinnati Ins. Co. v. Oancea*, 2004-Ohio-4272, ¶ 17 (Ohio Ct. App. 2004)). Plaintiffs do not respond to this argument but assert that Defendants' conduct was wanton or reckless only under Count 9. (ECF No. 71, PageID 1809–10.) Plaintiffs appear to have conceded Count 8.

Because Plaintiffs' federal claims do not survive the Motion for Summary Judgment, the Court **DECLINES** to exercise supplemental jurisdiction over the remaining state-law claims and **DISMISSES** them **WITHOUT PREJUDICE**, under 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the reasons stated in this Opinion and Order, the Court **DISMISSES without prejudice** Defendants Mandy Davis and John Roes #1-5, along with Plaintiffs' claims against them (Counts 4 and 6). Defendants' Motion for Summary Judgment (ECF No. 48) is **GRANTED** on Plaintiffs' federal law claims under Title IX and 42 U.S.C. § 1983 (Counts 1, 2, and 3). The Court **DECLINES** to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims under Counts 5, 7, 8, 9, and 10, and **DIMISSES** those claims **without prejudice**.

The Clerk is **DIRECTED** to enter judgment and **CLOSE** this case on the Court's docket.

**IT IS SO ORDERED.**

**9/23/2025**                                    **s/Edmund A. Sargus, Jr.**
**DATE**                                         **EDMUND A. SARGUS, JR.**
                                                 **UNITED STATES DISTRICT JUDGE**